IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JAY SILVERSTEIN, | ) | CIV. NO. 15-00097 SOM/KJM |
| | ) | |
| Plaintiff, | ) | ORDER (a) DISMISSING |
| | ) | RETALIATION CLAIM ASSERTED IN |
| vs. | ) | PARAGRAPHS 14, 17, 22, 24, |
| | ) | 25, AND 30 OF THE FIRST |
| ASHTON B. CARTER, in his | ) | AMENDED COMPLAINT, AND |
| capacity as the Secretary of | ) | (b) GRANTING IN PART AND |
| Defense, | ) | DENYING IN PART SUMMARY |
| | ) | JUDGMENT WITH RESPECT TO |
| Defendant. | ) | REMAINING CLAIMS |
| _____ | ) | |

**ORDER (a) DISMISSING RETALIATION CLAIM ASSERTED IN PARAGRAPHS 14, 17, 22, 24, 25, AND 30 OF THE FIRST AMENDED COMPLAINT, AND (b) GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT WITH RESPECT TO REMAINING CLAIMS**

I.      INTRODUCTION.

Plaintiff Jay Silverstein, a civilian employee with the Department of Defense, brings retaliation and hostile work environment claims under Title VII.

Defendant Ashton Carter, in his capacity as Secretary of Defense, moves for dismissal of Silverstein's First Amended Complaint, or alternatively for summary judgment on all claims.

Silverstein concedes that, because he either failed to administratively exhaust or was untimely in doing so, any retaliation claim asserted in paragraphs 14, 17, 22, 24, 25, and 30 of the First Amended Complaint should be dismissed, the sole exception being any retaliation claim relating to a trip to Laos. See ECF No. 50, PageID # 604. Relying on the failure to properly

exhaust, the court therefore dismisses any retaliation claim in any of these paragraphs other than the retaliation claim relating to the Laos trip.

The court grants in substantial part and denies in part Defendant's motion for summary judgment on the remaining claims. With respect to Silverstein's retaliation claim, summary judgment is denied to the extent the claim relates to the selection of a Supervisory Historian.  Summary judgment is granted in favor of Defendant on all other bases of his retaliation claim.  With respect to Silverstein's hostile work environment claim, summary judgment is granted to Defendant.

## II.      SUMMARY JUDGMENT STANDARD.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The movants must support their position concerning whether a material fact is genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial. T.W. Elec. Serv., 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); see also Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. Id. When "direct evidence"

4

produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  Id.

III.        **BACKGROUND.**

Since July 2009, Jay Silverstein has been a Supervising Investigation Site Survey Manager for the Department of Defense, POW/MIA Accounting Agency.  That agency, which acquired its present name in January 2015, was previously known as the Joint POW/MIA Accounting Command.  The agency locates and returns the remains of American soldiers killed in the service of this country.  For five years before becoming a Supervising Investigation Site Survey Manager, Silverstein was a Forensic Anthropologist with the agency's Central Identification Laboratory.  First Amended Complaint ¶¶ 4, 6, 9, ECF No. 14, PageID #s 39, 41; Answer to Amended Complaint ¶¶ 4, 6, 9, ECF No. 24, PageID #s 84-85 (admitting same).

In 2012, the agency had about 400 employees.  It now has more than 600 employees.  See Declaration of Kelly Fletcher ¶ 1, ECF No. 42-4, PageID # 388.

Silverstein claims to have suffered retaliation and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 based on a number of events.  Title VII forbids employment discrimination based on "race, color,

religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).
Title VII also has an anti-retaliation provision that forbids
discrimination against an employee who has opposed any unlawful
employment practice prohibited by Title VII or who has made a
charge, testified, assisted, or participated in a Title VII
proceeding or investigation.  42 U.S.C. § 2000e-3(a).

　　　　Silverstein brings his claims under Title VII, see
First Amended Complaint ¶¶ 1, 2, 3, ECF No. 14, PageID #s 38-39,
but the connection between Title VII and any alleged retaliation
or hostile work environment is often unclear.  In fact,
Silverstein himself concedes that he cannot proceed under Title
VII with respect to some of what he claims.  The court has no
duty to scour the record for facts not identified by a party in
the party's concise statement.  See Local Rule 56.1(f).
Silverstein's concise statement includes speculation and
conclusions, but lacks evidentiary support with respect to many
of his claims.  The court does its best in this order to examine
whether there is evidence that there was arguably retaliation or
a hostile work environment related to any matter covered by Title
VII, as well as to determine whether Silverstein raises any
genuine issues of fact that preclude summary judgment.

　　　　The court begins its analysis by examining
Silverstein's Title VII retaliation claim, determining that the
Government is entitled to dismissal of the parts of the claim

that were not properly exhausted and to summary judgment with
respect to all but one basis of the remaining parts of the
retaliation claim.  The court then turns its attention to the
Title VII hostile work environment claim, determining that the
Government is entitled to summary judgment with respect to the
hostile work environment claim.

## IV.       RETALIATION CLAIM.

### A.       Law Applicable to Title VII Retaliation Claims.

Title VII's anti-retaliation provision generally
forbids retaliation against an employee who has exercised rights
under Title VII.  See 42 U.S.C. § 2000e-3(a).  "Title VII
retaliation claims must be proved according to traditional
principles of but-for causation . . . .  This requires proof that
the unlawful retaliation would not have occurred in the absence
of the alleged wrongful action or actions of the employer."
Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533
(2013).

For purposes of a summary judgment motion, a plaintiff
may demonstrate a retaliation claim under Title VII by applying
the burden-shifting analysis set forth in McDonnell Douglas Corp.
v. Green, 411 U.S. 792 (1973).  See Villiarimo v. Aloha Island
Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).  Under the
McDonnell Douglas framework, a plaintiff must establish a prima
facie case of discrimination.  411 U.S. at 802.  The degree of

proof required to establish a prima facie case for summary judgment is minimal.  See Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1094 (9th Cir. 2005).

To make out a prima facie retaliation claim under Title VII, a plaintiff must show that "(1) the employee engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action."  Davis v. Team Elec. Co., 520 F.3d 1080, 1093-94 (9th Cir. 2008).

"Protected activity includes the filing of a charge or a complaint, or providing testimony regarding an employer's alleged unlawful practices, as well as engaging in other activity intended to oppose an employer's discriminatory practices.  Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003) (quotation marks and citation omitted); 42 U.S.C. § 2000e-3(a) (forbidding discrimination against employee who "opposed any unlawful employment practice prohibited by Title VII or who has made a charge, testified, assisted, or participated in a Title VII proceeding or investigation.").

For purposes of the second prong of the McDonnell Douglas framework, an "adverse employment action" is an action that is "materially adverse" to a reasonable employee or job applicant.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted).  An "adverse

employment action" is one that "materially affects the compensation, terms, conditions, or privileges of employment." Davis, 520 F.3d at 1089.  An "adverse employment action exists" when the employer's actions are so harmful that they could dissuade a reasonable worker from making or supporting a charge of discrimination.  White, 548 U.S. at 68.  Normally, "petty slights, minor annoyances, and simple lack of good manners" will not deter a reasonable worker from making a charge of discrimination, id., while termination, dissemination of a negative employment reference, issuance of an undeserved performance review, and refusal to consider a plaintiff for a promotion may.  See Brooks v. City of San Mateo, 229 F.3d 917, 928-29 (9th Cir. 2000).

The Ninth Circuit has adopted the EEOC's guidelines for what constitutes an adverse employment action in the Title VII context, ruling that an adverse employment action is any adverse treatment that "is reasonably likely to deter the charging party or others from engaging in protected activity."  Ray v. Henderson, 217 F.3d 1234, 1242-43 (9th Cir. 2000); accord Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 965 (9th Cir. 2004).  Thus, the Ninth Circuit defines "adverse employment actions" broadly, not limiting them to actions such as discharges, transfers, or demotions.  See Lyons v. England, 307 F.3d 1092, 1118 (9th Cir. 2002).  While adverse employment actions may

9

include lateral transfers, unfavorable job references, and changes in work schedules, not "every offensive utterance by co-workers" is an adverse employment action because "offensive statements by co-workers do not reasonably deter employees from engaging in protected activity." Ray, 217 F.3d at 1243.

Although the present order is divided into a retaliation section and a hostile work environment section, there is an overlap. The Ninth Circuit has recognized that actionable retaliation may occur in the form of a hostile work environment; that is, a hostile work environment may be considered an adverse employment action for purposes of a claim alleging retaliation resulting from an employee's protected activity. See Ray, 217 F.3d at 1245. However, "a hostile work environment can form the basis for a retaliation claim only when the harassment is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Morgan v. Napolitano, 988 F. Supp. 2d 1162, 1174 (E.D. Cal. 2013) (quoting Ray, 217 F.3d at 1245).

With respect to the causation requirement in a prima facie case of retaliation, a court may infer causation when an adverse employment action occurs "fairly soon after the employee's protected expression." See Villiarimo, 281 F.3d at 1065. "Causation sufficient to establish the . . . [causal link] element of the prima facie case may be inferred from

10

circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

As this court has noted, a "temporal distance of several months makes a causal link more difficult to prove; a distance of five years severely undermines it." Stucky v. State of Haw., Dept. of Educ., 2007 WL 602105, *5 (D. Haw. Feb. 15, 2007). Compare Nidds v. Schindler Elevator Corp., 113 F.3d 912, 919 (9th Cir. 1996) (four-month period between protected activity and layoff was sufficiently close to satisfy "causal link" prong), and Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (three-month period sufficient to infer causation), with Manatt v. Bank of Am., NA, 339 F.3d 792, 802 (9th Cir. 2003) (no causal inference possible when nine months separated protected activity from adverse employment action).

Some years after the Ninth Circuit decided Nidds and Yartzoff, the Supreme Court observed in Clark County School District v. Breeden, 532 U.S. 268, 273 (2001), that the requisite "temporal proximity must be 'very close.'" Breeden cites with approval cases from the Seventh and Tenth Circuits holding that three- and four-month periods do not support an inference of causation. Id. More recently, the Ninth Circuit has cautioned

11

courts against engaging in a "mechanical inquiry into the amount
of time between the speech and alleged retaliatory action."
Anthoine v. N. Central Counties Consortium, 605 F.3d 740, 751
(9th Cir. 2010).  In short, there is no "bright line" rule
providing that any particular period is always too long or always
short enough to support an inference.  See Coszalter v. City of
Salem, 320 F.3d 968, 977-78 (9th Cir. 2003).

Under the McDonnell Douglas framework, once a plaintiff
succeeds in presenting a prima facie case, the burden then shifts
to the defendant to articulate a "legitimate, nondiscriminatory
reason" for its employment decision.  Noyes v. Kelly Servs., 488
F.3d 1163, 1168 (9th Cir. 2007).  "Should the defendant carry its
burden, the burden then shifts back to the plaintiff to raise a
triable issue of fact that the defendant's proffered reason was a
pretext for unlawful discrimination."  Id.

Any Title VII retaliation claim must be timely.  In
National Railroad Passenger Corporation v. Morgan, the Supreme
Court explained that a plaintiff may assert claims based on
discrete acts only if the plaintiff timely exhausted his claim:

> [D]iscrete discriminatory acts are not
> actionable if time barred, even when they are
> related to acts alleged in timely filed
> charges.  Because each discrete act starts a
> new clock for filing charges alleging that
> act, the charge must be filed within the
> [applicable] period after the act occurred.
> The existence of past acts and the employee's
> prior knowledge of their occurrence, however,
> does not bar employees from filing charges

> about related discrete acts so long as the
> acts are independently discriminatory and
> charges addressing those acts are themselves
> timely filed.  Nor does the statute bar an
> employee from using the prior acts as
> background evidence to support a timely
> claim.  In addition, the time period for
> filing a charge remains subject to
> application of equitable doctrines such as
> waiver, estoppel, and tolling.

536 U.S. 101, 102 (2002).

As a federal employee, Silverstein was required to initiate contact with an employment discrimination counselor within 45 days of an alleged discriminatory act.  See 29 C.F.R. § 1614.105(a)(1).  This counselor, referred to as an Equal Employment Opportunity ("EEO") counselor, is part of the employer's internal system, not part of the independent Equal Employment Opportunity Commission.  When the EEO counselor does not resolve the matter, an aggrieved employee must then file a complaint with the agency that allegedly discriminated against him or her, assuming the matter does not go through the Merit Systems Protection Board process.  29 C.F.R. § 1614.106(a) and (b).  If the agency dismisses the complaint and issues a final decision regarding such a complaint pursuant to § 1614.107, the decision must contain a "notice of the right to appeal the final action to the Equal Employment Opportunity Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits."  See 29 C.F.R. § 1614.110(b).

13

**B.    Based on Silverstein's Failure to Properly Exhaust, the Court Dismisses the Retaliation Claim (Except Insofar as It Relates to the Cancellation of Silverstein's Trip to Laos) To the Extent the Claim is Based on Factual Allegations in Paragraphs 14, 17, 22, 24, 25, and 30 of the First Amended Complaint.**

The details of what occurred in administrative proceedings relating to Silverstein's claims are largely missing from the record.  Nor does this court have the final agency decision or any notice of right to sue.  It is not even clear whether Silverstein pursued his claims with the Equal Employment Opportunity Commission.  What is clear is that no party challenges Silverstein's exhaustion of his administrative remedies, except as set forth in the next paragraph.

Defendant argues that, except with respect to the cancellation of a trip to Laos, Silverstein did not exhaust his retaliation claim to the extent it is based on factual allegations in paragraphs 14, 17, 22, 24, 25, and 30 of the First Amended Complaint.  In his Opposition, Silverstein agrees that, because he failed to administratively exhaust any retaliation claim based on those allegations, or untimely did so, the court should dismiss the retaliation claim arising out of the facts alleged in paragraphs 14 (2010 Tarawa Atoll mission), 17 (reprimand for abuse of Government property), 22 (discussion arising out of University of Hawaii proposal), 24 (October 2011 counseling regarding preparation of reports), 25 (April 2012

14

grievance), and 30 (2012 Tarawa Atoll mission) of the First
Amended Complaint.  <u>See</u> ECF No. 50, PageID # 604.  Putting aside
the allegations about the Laos trip, this court therefore
dismisses as not properly exhausted Silverstein's retaliation
claim to the extent based on the facts alleged in the identified
paragraphs.  In dismissing what Silverstein concedes was not
properly exhausted, the court treats Silverstein's concession as
akin to a voluntary dismissal of the affected matters pursuant to
Rule 41(a)(1) of the Federal Rules of Civil Procedure.  The
dismissal does not rely on factual assertions outside the First
Amended Complaint or on evidence.

> **C.** **The Court Grants Summary Judgment in Favor of
> Defendants With Respect to the Remaining Parts of
> the Retaliation Claim, Except For the Portion of
> the Retaliation Claim Relating to the Failure to
> Promote Silverstein to the Supervisory Historian
> Position.**

The First Amended Complaint asserts retaliation in
violation of Title VII, but it does not clearly link allegedly
retaliatory events to the exercise of rights under Title VII.
The court examines the remaining allegedly retaliatory events
below, determining that the Government is entitled to summary
judgment with respect to all but one event alleged to have been
retaliatory.

### 1.  General Allegations that Silverstein Supported Women Co-Workers.

Silverstein appears to be broadly asserting that he was retaliated against for having supported women co-workers who were allegedly discriminated against based on their gender.  But Silverstein does not point to any evidence supporting a relationship between the allegedly retaliatory acts and that support.  At the hearing on the present motion, Silverstein indicated that any associational discrimination claim he is bringing is tied to actual things Defendant knew he had said or done (i.e., to protected activity), not to having been discriminated against simply for having felt supportive of women or for having befriended them.

With respect to his actions supporting women co-workers, Silverstein does not establish that any of the acts he complains of were close enough in time to the things that he said or did that causation can be inferred.  For example, as discussed in more detail below, he says he was discriminated against because he supported Dr. Joan Baker's 2009 gender discrimination complaint and because he protested the alleged harassment of Dr. Kristina Giannotta in May 2011.  Not only has Silverstein conceded that his failure to administratively exhaust precludes any recovery of damages for direct discrimination  based on his support for Dr. Baker and Dr. Giannotta, any retaliation he says he suffered occurred so long after that support that that

16

causation cannot be inferred.  Silverstein must instead point to some evidence of causation.  This court discusses later in this order Silverstein's EEO complaints, which alleged "reprisals" for his support of women co-workers.  With respect to any alleged retaliation preceding October 2012, when Silverstein's informal EEO complaint was filed, Silverstein presents no evidence of a causal connection between his actions in support of women co-workers and an adverse employment action.

Moreover, his clarification that this particular broad claim of retaliation is based on things he himself said or did underscores the irrelevancy of anonymous survey responses that Silverstein earlier sought to have this court consider.  See ECF No. 54. (Motion to File Publicly Exhibits 33, 34 and 35 to His Concise Statement of Facts to His Memorandum in Opposition to Defendant's Motion to Dismiss and Summary Judgment).  Silverstein contended that the anonymous survey responses showed general concern among agency employees about sex discrimination.  This court denied that motion, noting that the court could not tell whether the survey responses related to matters Silverstein was suing over.  The court also notes here that it has no way of knowing whether the responses might be from the very people whose declarations are already before the court (such as Silverstein himself).  If the responses were from the same people, then they should not be used as evidence that sex discrimination was so

rampant that it was noted even by those uninvolved with the present lawsuit.

##### 2.    2005 Support of Dr. Elliot Moore.

Silverstein says that, in 2005, he complained about what he viewed as the Central Identification Laboratory's publicly humiliating treatment of one of his colleagues, Dr. Elliot Moore.  Silverstein says that Dr. Moore, who is deaf, was assigned a small desk in the middle of a well-traveled hallway, and that this location prevented Dr. Moore from having access to a TELEX machine that had been provided to accommodate his disability.  <u>See</u> Decl. of Jay Silverstein ¶ 11(a), ECF No. 51-1, PageID # 625; <u>see also</u> Report of Investigation (Nov. 7, 2013), ECF No. 42-10, PageID # 413 (indicating that Silverstein "voiced opposition to the way management treated a disabled employee (in approximately 2005 or 2006)").  Silverstein also says that Moore and another employee, Dr. David Rankin, were investigated.  <u>Id.</u>

Even if the court assumes that Silverstein's retaliation claim relating to the 2005 treatment of Dr. Moore and Dr. Rankin is timely, Silverstein does not indicate how his opposition to Moore's or Rankin's treatment constituted protected activity under Title VII.  That is, Silverstein does not submit any evidence demonstrating that the treatment of Moore or Rankin, or, for that matter, Silverstein's opposition to that treatment

related to anyone's race, color, religion, sex, or national origin, the classes protected by Title VII.  42 U.S.C. § 2000e-2(a)(1).  Even if the First Amended Complaint included a claim relating to the Americans with Disabilities Act, Silverstein does not provide evidence that any investigation was tied to Moore's hearing disability.  In fact, the record contains no hint as to what the subject of the investigation was.  At most, Moore says he was investigated and simply concludes that Silverstein was retaliated against for having supported him.  See Decl. of Chester Elliott Moore, II ¶¶ 3, 6, ECF No. 51-2, PageID # 644-45.

The court therefore grants summary judgment in favor of the Government with respect to any Title VII retaliation claim relating to Silverstein's support of Moore and Rankin in or around 2005.

### 3.   Association with Dr. Joan Baker in 2009.

On October 6, 2009, Dr. Joan Baker filed a Title VII gender discrimination complaint in this court.  See Baker v. Mabus, Civ. No. 09-00470 SOM/LEK, ECF No. 1.  Dr. Baker alleged that Dr. Thomas Holland, the Scientific Director of the Joint POW/MIA Accounting Command, had sexually harassed her.  Id. Baker ultimately settled that suit.  See Baker, Civ. No. 09-00470 SOM/LEK, ECF No. 33 (minute order indicating settlement); see also First Amended Complaint ¶ 18, PageID # 44; Answer ¶ 18 (admitting allegation).  According to Baker, Silverstein's

19

association with her contributed to alleged hostility against Silverstein.  <u>See</u> Decl. of Joan E. Baker, Ph.D ¶ 32, ECF No. 51-4, PageID # 669.

Silverstein claims in the present lawsuit that he was retaliated against for having provided support to Baker in 2009, but it is unclear what form either his support or the alleged retaliation took or that the alleged retaliation was reasonably close in time to that support.  <u>See, e.g.</u>, Opposition at 24, ECF No. 50, PageID # 606 ("He has engaged in protected activity by way of objecting to discriminatory treatment of other JPAC/DPAA employees such as Baker, Giannotta and Moore, as well as filing his own grievance and EEO complaints for the harassment and retaliation by JPAC/DPAA managers.  As a result of his protected activities, Plaintiff has been subjected to several adverse employment actions described in his declaration.").

Silverstein may be arguing that the alleged retaliation consisted of (1) pulling his team from a March 2010 deployment to Tarawa Atoll; (2) an August 2010 reprimand by his supervisor, Robert Richeson; and (3) a 2011 counseling by Richeson concerning a proposed University of Hawaii project.  <u>See</u> Decl. of Jay Silverstein, ECF No. 50-1 (listing events without connecting them to any particular matter relevant to Title VII); Report of Investigation (Sept. 1, 2014) (indicating that Richeson is Silverstein's "first level supervisor").  However, as discussed

20

below, Silverstein did not administratively exhaust claims
relating to the March 2010 Tarawa Atoll deployment, the August
2011 reprimand, or the 2011 counseling.  Moreover, Silverstein
provides no admissible evidence that the cancellation of the
deployment, the reprimand, or the counseling occurred because
Silverstein acted to support Baker's Title VII case.  Silverstein
only speculates that Dr. Holland, who was criticized in Baker's
complaint, forced Richeson to take those actions.

### a.  March 2010 Cancellation of Deployment to Tarawa Atoll.

Paragraph 14 of the First Amended Complaint alleges
that Dr. Gregory Fox cancelled a March 2010 deployment of
Silverstein's team to Tarawa Atoll.  See ECF No. 14, PageID # 43;
see also Silverstein Decl. ¶ 16, ECF No. 50-1, PageID # 628.  But
Silverstein provides no detail about the cancellation.  As noted
above, Silverstein concedes that he did not exhaust any claim
relating to the cancellation of his team's deployment to Tarawa
Atoll in March 2010.  See ECF No. 50, PageID # 604 (admitting
that Silverstein did not properly exhaust any claim arising out
of paragraph 14 of First Amended Complaint, which pertains to the
March 2010 Tarawa trip).  For that reason, the court dismisses
any retaliation claim relating to the cancellation of that trip.

###### b.   August 2010 Reprimand by Richeson.

Silverstein received a letter from Robert Richeson, Silverstein's supervisor, in August 2010, reprimanding him for having abused government property.  See First Amended Complaint ¶ 17, ECF No. 14, PageID # 43-44 (alleging that, in August 2010, Richeson reprimanded him for abusing Government property). Silverstein did not properly exhaust his administrative remedies with respect to any claim relating to that reprimand.  See ECF No. 50, PageID # 604 (admitting that Silverstein did not properly exhaust any claim arising out of paragraph 17 of First Amended Complaint, which pertains to the August 2010 reprimand).  For that reason, the court dismisses any retaliation claim relating to the reprimand.

According to Richeson, he reprimanded Silverstein for having taken equipment to Egypt without obtaining proper permission.  Richeson says that Silverstein appealed the reprimand, which was rescinded.  See Declaration of Robert Richeson ¶ 2, ECF No. 42-9, PageID # 407-08.  It is not clear what remaining injury Silverstein seeks to redress in this lawsuit in connection with the reprimand.

Nor is it clear why Silverstein thinks that Richeson's reprimand was in retaliation for Silverstein's support of or association with Baker.  At best, Silverstein says that he "found" that Holland, alleged to have been a bad actor in Baker's

federal court complaint, "coerced Mr. Richeson [to issue the reprimand] by threats of more severe action."  Silverstein Decl. ¶ 19, ECF No. 51-1, PageID # 629; ECF No. 50, PageID # 587. Silverstein also says that the reprimand was based on a false statement by another employee, Dr. William Belcher, and that Richeson congratulated Silverstein when the reprimand was revoked.  Silverstein Decl. ¶ 19.  However, because Silverstein does not show that he has personal knowledge about any alleged coercion or otherwise describe the source of his "finding," he does not show that he has admissible evidence of coercion.  And, even if there was a false statement by Dr. Belcher, Silverstein does not point to evidence of any supervisor's knowledge that the statement was false.

### c.   Counseling by Richeson About 2011 University of Hawaii Project.

Silverstein also appears to be claiming that his support for Baker led to his being counseled by Richeson about a potential project with the University of Hawaii.  See First Amended Complaint ¶ 22, ECF No. 14, PageID # 45.  Richeson says he did express concern that Silverstein had discussed the project with university representatives without informing Richeson or anyone else in the chain of command.  The counseling was not noted in Silverstein's personnel file and had no effect on his pay, benefits, or working conditions.  See Declaration of Robert Richeson ¶ 3, ECF No. 42-9, PageID # 408.  It therefore does not

appear to satisfy the "adverse employment action" required for a
Title VII retaliation claim.

Moreover, Silverstein concedes that, even if the
counseling occurred in retaliation for his having supported
Baker, he did not properly exhaust his administrative remedies
with respect to this counseling event.  See ECF No. 50, PageID
# 604 (admitting that Silverstein did not properly exhaust any
claim relating to paragraph 22 of First Amended Complaint, which
pertains to 2011 counseling).  For that reason, the court
dismisses any retaliation claim relating to the counseling.

### 4.   May 2011 Protest of Alleged Harassment of Dr. Kristina Giannotta.

Silverstein says that, in May 2011, he protested the
harassment of one of his co-workers, Dr. Kristina Giannotta.  See
First Amended Complaint ¶ 23, ECF No. 14, PageID # 45.
Silverstein argues that he suffered retaliation for that support,
but he does not indicate the nature of the retaliation.   At the
hearing on the present motion, he said that he is not seeking
damages with respect to having protested the alleged harassment
of Giannotta, but that he is seeking injunctive relief.  Because
the record does not indicate that Giannotta continues to be
harassed or that retaliation continues against Silverstein for
having protested past harassment of Giannotta, this court has
before it nothing in the record that supports an injunction in
this regard.

### 5.   **Ethics Complaints**.

Silverstein says that, on May 17, 2011, he reported ethics violations concerning "malfeasance of duty, waste of funds, and ethical issues" by Dr. John Byrd and Dr. Gregory Fox. See Silverstein Decl. ¶ 28(e), ECF No. 51-1, PageID # 635. Nothing in the record ties this ethics complaint to Title VII. Silverstein says that he was told by Richeson that, if Silverstein "pushed" the ethics complaint, he and his people would suffer.  Richeson allegedly told him to make the complaint disappear.  See Silverstein Decl. ¶ 20, ECF No. 51-1, PageID # 629.  Silverstein then withdrew his 2011 complaint.  See id.

In April 2012, Silverstein says he filed a second ethics complaint "for violations of procedure and ethics regarding recovery documentation."  Silverstein alleges that an investigation was conducted, but he does not know what the findings were.  See First Amended Complaint ¶ 26, ECF No. 14, PageID # 45-46.  The April 2012 ethics complaint was a resubmission of the complaint Silverstein had submitted in May 2011 pertaining to waste and abuse by Dr. Byrd and Dr. Fox.  See Silverstein Decl. ¶ 23, ECF No. 50-1, PageID # 631.

Silverstein identifies five matters that he attributes to retaliation for his submission of ethics complaints.  The court examines each of the five matters below, noting at the onset that Silverstein does not provide evidence that any of them

25

relates to any Title VII issue.  To the extent Silverstein
asserts Title VII retaliation for his having submitted ethics
complaints, summary judgment is granted in Defendant's favor.

### a.   October 2011 Reminder.

It appears that Silverstein is arguing that a reminder
he received from his supervisor in October 2011 was retaliation
for his submission of the May 2011 ethics complaint.  According
to Richeson, he and Silverstein discussed Silverstein's alleged
failure to properly report the discovery of human remains found
in the Tarawa Atoll.  See Declaration of Robert Richeson ¶ 4, ECF
No. 42-9, PageID # 408.  Silverstein was supposed to prepare a
report to go to the Central Identification Laboratory as well as
to others, and then to follow directions as to how to proceed.
Id.  Richeson says he did nothing more than remind Silverstein of
this protocol.  Id.  Silverstein refers to this discussion in
paragraph 24 of the First Amended Complaint, but, having failed
to administratively exhaust his remedies with respect to having
received this reminder, is not pursuing relief in connection with
it.  See ECF No. 50, PageID # 604 (admitting that Silverstein did
not properly exhaust any claim arising out of paragraph 24 of
First Amended Complaint, which pertains to October 2011
reminder).  For that reason, the court dismisses any retaliation
claim relating to that reminder.  In any event, as noted above,
nothing ties the ethics complaint to an exercise of any Title VII

right on which a Title VII retaliation claim might be based, and the reminder does not appear to qualify as an adverse employment action.

### b. September 2012 Tarawa Atoll Mission.

Silverstein says he was pulled from a mission to Tarawa Atoll in September 2012, see First Amended Complaint ¶ 30, ECF No. 14, PageID # 46, in retaliation for having submitted the April 2012 ethics complaint. Silverstein says Ronald Minty was the person who refused to allow him to deploy to Tarawa Atoll in 2012. See Silverstein Decl. ¶ 4, ECF No, 50-1, PageID # 623. At the hearing on the present motion, Silverstein indicated that he had criticized Minty, but the record contains no evidence that there was such criticism or that it related to Title VII. Silverstein concedes that he did not administratively exhaust any retaliation claim relating to the Tarawa Atoll mission in September 2012. See ECF No. 50, PageID # 604 (admitting that Silverstein did not properly exhaust any retaliation claim arising out of paragraph 30 of First Amended Complaint, which pertains to September 2012 Tarawa Atoll mission). For that reason, the court dismisses any retaliation claim arising out of the cancellation of that trip, noting in any event that nothing in the record ties the April 2012 ethics complaint to any exercise of Title VII rights on which a retaliation claim might be based.

In addition, Defendant demonstrates that it had a legitimate, nondiscriminatory reason for pulling Silverstein from that mission.  Gregory Fox, a Laboratory Manager with the Central Identification Laboratory, says that he voiced opposition to Silverstein's proposed use of ground penetrating radar in Tarawa Atoll because it was an "inappropriate technique at that time." Fox says that many of the battlefield cemeteries were already partially excavated and that the Joint POW/MIA Accounting Command needed to complete research into the identities of service members who were still missing.  Fox also opposed the use of ground penetrating radar because that equipment would create many false positives that would lead to extra work in the form of more investigations of possible remains.  See Declaration of Gregory Fox ¶ 3, ECF No. 42-5, PageID #s 393-94.  Silverstein was aware that the Central Identification Laboratory doubted the usefulness of ground penetrating radar.  See Silverstein Depo. at 47, ECF No. 42-13, PageID # 47.

Fox also recalls that the mission to Tarawa Atoll was cancelled by Operations (referred to as J3) for budgetary reasons, not because of Fox's opposition.  See Declaration of Gregory Fox ¶¶ 3-5, ECF No. 42-5, PageID #s 393-94.  William Belcher, the Recovery Leader for the Tarawa Atoll deployment, says he told Operations (J3) that an analyst (Silverstein's position) was not necessary for the deployment, given the

28

Recovery Team's planned focus on excavating five known sites.
See Decl. of William Belcher ¶ 11, ECF No. 42-3, PageID # 386.

Perhaps because he concedes that any retaliation claim
based on the 2012 Tarawa Atoll mission should be dismissed as
unexhausted, Silverstein does not address whether these reasons
were pretextual.

### c.    Denial of Leave to Accept Award.

Silverstein claims that, in September 2012, he faced
retaliation for having lodged the April 2012 ethics complaint.
Silverstein says this retaliation came in the form of being
denied either administrative or personal leave to travel to
accept the 2012 Military Achievement Award by the United States
Geospatial Intelligence Foundation.  See First Amended Complaint
¶ 31, ECF No. 14, PageID # 46-47; ECF No. 51-19.  The award was
to be presented on October 12, 2013, in Florida.  ECF No. 51-19,
PageID # 843; see also Sept. 4, 2012 E-mail from Silverstein to
Robert Richeson, ECF No. 51-9, PageID # 843 (stating that award
ceremony was scheduled for October 12, 2012, in Florida).

According to a video of the award presentation, the
Intelligence Achievement Award--Military went to the Joint
Prisoners of War/Missing in Action Accounting Command, in which
Silverstein was the "lead," not to Silverstein personally.  See
http://geointv.com/archive/geoint-2012-usgif-awards-program-prese
ntations/ (last visited August 9, 2016) (beginning approximately

9:08 into video); see also Silverstein Decl. ¶ 26 (indicating award given to Joint POW/MIA Accounting Command).

   As this court has already noted, the ethics complaint was unrelated to Title VII.  Silverstein therefore fails to demonstrate a prima facie case of retaliation based on an exercise of Title VII rights.

   Additionally, Silverstein concedes on page 88 of his deposition that, at the time he submitted his leave request, there was significant uncertainty about funding because Congress had not approved appropriations for the upcoming fiscal year. See ECF No. 42-13, PageID # 446.  In fact, although Silverstein correctly indicated at the hearing on the present motion that there was no federal government shutdown in 2012, the court takes judicial notice that the federal government was threatened with a shutdown as the start of fiscal year 2013 approached.  No shutdown actually occurred then because Congress passed a funding bill on September 22, 2012, shortly before fiscal year 2012 ended on September 30, 2012.  See http://www.reuters.com/article/us-usa-congress-shutdown-i dUSBRE88L03720120922 (last visited August 9, 2016).

   Kelly Fletcher, the Chief of Staff for the Department of Defense, POW/MIA Accounting Agency, says that travel to accept the award at government expense would normally have been approved.  However, Fletcher was concerned that congressional

inaction on appropriations for fiscal year 2013 would leave the agency without funds for travel in October 2012.  See Decl. of Kelly Fletcher ¶¶ 3-4, ECF No. 42-4, PageID # 389.  Fletcher acknowledges that Silverstein offered to travel to receive the award at Silverstein's expense.  Fletcher says this offer was declined in light of concern that payment by Silverstein out of his personal funds for work-related travel during a government shutdown would have constituted working for free in violation of the Anti-Deficiency Act.  Id. ¶ 5, PageID # 390; see also Answer ¶ 31, ECF No. 24, PageID # 88.

Even assuming that Title VII rights were in issue, Silverstein does not show that Kelly Fletcher (the decisionmaker) even knew of the ethics complaints such that retaliation might have occurred.

While claiming that Defendant's reasons are pretextual, Silverstein provides no evidence at all of pretext.  On page 26 of his Opposition, he simply states that the reasons must be pretextual.  See ECF No. 50, PageID # 608.  This court recognizes that evidence of pretext is usually circumstantial, not direct. But as difficult as providing evidence of pretext is, a plaintiff must make some showing of pretext.  As Silverstein makes none, summary judgment is granted in Defendant's favor to the extent Silverstein asserts a retaliation claim based on the denial of leave to accept the award.

### d.   Transfer of Two Employees.

Silverstein also claims that he was retaliated against

for his ethics complaints by having his section reorganized and

two of his key employees transferred to another section in

October 2012.[1]  Silverstein says that the reassignment of the two

employees led to his being told that he too would be transferred

to another section.  See First Amended Complaint ¶¶ 32, 33, ECF

No. 14, PageID # 47.  Even if Silverstein could show that the

transfer related to his exercise of Title VII rights, which he

does not, the Government offers legitimate, nondiscriminatory

reasons supported by the record for its actions.

Kelly Fletcher says that the reorganization and

reassignments were being planned months before October 2012.

Fletcher started working for the Joint POW/MIA Accounting Command

in July 2012 and recalls an early request for help in

---

[1]October 2012 was also the month in which Silverstein
initiated contact with an EEO counselor and then filed an
informal EEO complaint.  The content of the informal complaint is
not included in the record.  Even assuming that content related
to Title VII such that the initial contact and the informal
complaint constituted protected activity for purposes of a Title
VII retaliation claim, there is no evidence of any causal
connection between any purported protected activity and the
reorganization or the reassignment of Silverstein's co-workers.
In fact, there is no evidence that Fletcher or anyone else
involved in the reorganization or reassignment decision knew
about any purported protected activity at the time the decision
was made.  Of course, if the subject of Silverstein's initial
contact and informal complaint was, in fact, the reorganization
and reassignment, the initial contact and informal complaint
could not have caused that reorganization and reassignment.

implementing a significant reorganization.  <u>See</u> Decl. of Kelly
Fletcher ¶ 5, ECF No. 42-4, PageID # 390.  A reorganization plan
was proposed on July 25, 2012.  <u>See</u> ECF No. 42-14, PageID #s 459-
62.  Fletcher says that, under the plan, at least 50 individuals
were reassigned.  According to Fletcher, both of the employees
from Silverstein's research section were reassigned because their
work involved Geographic Information System data and mapping,
which had broad application to many sections of the Joint POW/MIA
Accounting Command.  <u>See</u> Decl. of Kelly Fletcher ¶ 6, ECF No. 42-
4, PageID # 390.  Fletcher says that, although the reorganization
was approved in July 2012, implementation was delayed until
October 2012.  <u>Id.</u> ¶ 6, ECF No. 42-4, PageID # 391.  Both of the
employees in issue were later transferred back to Silverstein's
section.  <u>See</u> Silverstein Decl. ¶ 25, ECF No. 51-1, PageID # 632.

        Viewing the facts in the light most favorable to
Silverstein, the court treats July 2012 as the time relevant to
the reassignments.  That time was reasonably close to
Silverstein's April 2012 ethics complaint.  However, as noted
above, Silverstein does not tie his ethics complaints to Title
VII.  Nor does Silverstein raise a genuine issue of fact as to
whether Fletcher's reason for transferring the employees was
pretextual.

        At most, Silverstein's opposition calls the transfer of
the personnel a "malicious act."  However, there is no evidence

                                    33

in the record establishing that Fletcher even knew about the
ethics complaints when reorganizing the department.  See ECF No.
50, PageID # 608.  Dr. Giannotta states that the reorganization
served no purpose other than to remove the individuals from
Silverstein's supervision, and that the reassigned employees'
desks were not even moved.  See Declaration of Kristina Giannotta
¶ 6, PhD., ECF No. 51-3, PageID # 650.  But no one disputes that
their work applied to sections beyond Silverstein's, and, even if
the reassignment was "malicious," nothing ties that malice to any
matter prohibited by Title VII.

> **e.   Denial of Limited Duty for Medical
> Reasons.**

Silverstein claims further retaliation for his ethics
complaints when he was told on October 10, 2012, that he was
being denied permission to have limited work duty, as recommended
by his doctor.  See First Amended Complaint ¶ 34, ECF No. 14,
PageID # 47.  Even assuming that Robert Richeson, the Director
for the Research and Analysis Group of Joint POW/MIA Accounting
Command, denied Silverstein's telework request knowing of the
ethics complaints, Defendant presents a legitimate,
nondiscriminatory reason for the denial.  Richeson says that, in
October 2012, he denied Silverstein's request to work from home
because the agency had no teleworking policy.  Richeson says that
he confirmed with Chief of Staff Kelly Fletcher that teleworking

34

was not permitted.  <u>See</u> Decl. of Robert Richeson ¶ 5, ECF No. 42-9, PageID #s 408-09.

Richeson also says that Silverstein failed to provide details about a medical condition justifying the telework request, and that, had he done so, Richeson might have lobbied Fletcher to make an exception.  <u>See</u> Richeson Decl. ¶ 5, ECF No. 42-9, PageID # 409.  Exhibit 8, ECF No. 42-17, is a copy of an e-mail chain in which Silverstein asked to work no more than eight hours per week in the office and was told by Richeson that, although Silverstein might not have wanted to discuss personal health issues, Richeson needed "more clarity" before he could entertain the request to work from home.  Page 102 of Silverstein's deposition corroborates this e-mail exchange.  <u>See</u> ECF No. 42-13, PageID # 451.

Although Silverstein did not at the time explain his medical reason to Richeson, Silverstein now says that the leave request was related to the stress of being in a work environment hostile to him, as well as to the retaliation he suffered in October 2012 in the form of being denied leave to accept the award and of having two employees transferred.  <u>See</u> Silverstein Decl. ¶ 25, ECF No. 51-1, PageID # 632.

Claiming that the reason articulated by Richeson is pretextual, Silverstein points to a policy he says allowed such leave, "DOC Instruction 1035.01."  <u>See</u> ECF No. 50, PageID # 609;

Decl. of Jay Silverstein, ECF No. 51-1, PageID # 632.  This
alleged policy, attached to Defendant's reply memorandum as
Exhibit 20, ECF No. 58-1, provides only for the Department of the
Defense to develop a teleworking policy.  The document does not
include an actual telework policy.  See ECF No. 58-1, PageID
# 1021.  No evidence of pretext undercuts Defendant's explanation
of why leave to telework was denied.

Again, the court notes that, even if the denial of
limited duty constituted retaliation for Silverstein's submission
of ethics complaints, those ethics complaints were unrelated to
Title VII and so did not constitute "protected activity" under
Title VII.  Any retaliation flowing from the ethics complaints is
thus not actionable under Title VII.

### 6.    2012-13 EEO Complaints.

Besides filing ethics complaints, Silverstein submitted
employment discrimination complaints to his employer's "Equal
Employment Opportunity" staff.  He says that Defendant's response
was to take four retaliatory actions against him.  Defendant
offers legitimate nondiscriminatory reasons for having taken the
actions Silverstein complains of, but, for one of the four
actions, this court identifies genuine issues of material fact
that preclude summary judgment.

The activities involving Defendant's EEO staff began on
October 3, 2012, when Silverstein contacted a Department of

36

Defense EEO counselor.  On October 18, 2012, Silverstein filed an informal complaint of discrimination with EEO staff.  On January 15, 2013, Silverstein filed a formal complaint of discrimination with the Department of Defense.  See First Amended Complaint ¶¶ 42-43, ECF No. 14, PageID # 49; Answer ¶¶ 42-43 (admitting same).

As this court has already noted, the content of the contact on October 3, 2012, and the informal complaint of October 18, 2012, is not clear from the record.  Nor does the record include the formal complaint filed on January 15, 2013, or any other formal EEO complaint filed by Silverstein.  The record does include the Report of Investigation relating to the complaint of January 15, 2013, see ECF No. 42-10, as well as Reports of Investigation relating to subsequent complaints Silverstein submitted to the Department of Defense.  An EEO complaint submitted on April 14, 2014, ECF No. 42-11, apparently related to a cancelled deployment to Laos and other events in early 2014, while an internal EEO complaint submitted on November 6, 2014, ECF No. 42-12, apparently related to Silverstein's not having been selected for the Supervisory Historian position.

The January 2013 complaint is described in a Report of Investigation as having been "based on religion (Jewish) and reprisal (witness in co-worker's EEO complaints)."  ECF No. 42-11, PageID # 418; see also ECF No. 42-12, PageID # 427 (January 2013 complaint "based on religion and reprisal (opposition)").

"Reprisal" is also mentioned with respect to the later complaints.  See ECF No. 42-11, PageID # 418; ECF No. 42-12, PageID # 426.  Silverstein may have ultimately withdrawn any religion-based claim.  See ECF No. 42-10, PageID # 413 n.1.

The Report of Investigation relating to the April 2014 EEO complaint also notes that Holland had written a letter seeking the termination of Reimi Patterson-Davidson, an agency Historian, and that Silverstein's section had petitioned to have Ms. Patterson-Davidson transferred to Silverstein's section.  The Report of Investigation says that Silverstein's section believed that "management's action was possibly racially motivated."  See ECF No. 42-11, PageID # 419.  This could be part of what Silverstein was referring to in paragraph 38 of the First Amended Complaint, which describes "a pattern of transferring CIL employees . . . that are either being disciplined or terminated for inefficiency or workplace malfeasance."  See ECF No. 14, PageID # 48.

As described in the Reports of Investigation spanning the period from November 7, 2013, to March 24, 2015, ECF Nos. 42-10 to 42-12, Silverstein's complaints to his employer's EEO staff appear to have related to religion, sex (if the "reprisals" were connected to Silverstein's support of women co-workers), and race, all matters within the scope of Title VII.  If Silverstein was retaliated against for lodging EEO complaints, that

retaliation is actionable under Title VII without regard to whether any EEO complaint was sustained.  This court identifies four events that Silverstein characterizes as retaliation for his EEO Complaints.

### a.   2012 Performance Review.

Silverstein contends that he received a poor performance review in retaliation for an EEO complaint. Silverstein says he received a "minimally acceptable" rating on his 2012 Annual Performance Review.  See First Amended Complaint ¶ 35, ECF No. 14, PageID # 47.  But Lawrence Gonzales, Silverstein's supervisor, says that he rated Silverstein "acceptable" on his 2012 Annual Performance (dated December 13, 2012) in each of four categories, and that "acceptable" was the highest rating available.  See Decl. of Lawrence Gonzales ¶ 2, ECF No. 42-7, PageID # 400; Department of the Navy (DON) Interim Performance Appraisal Form, ECF No. 42-18, PageID # 476 (indicating date of performance rating) and PageID # 494 (rating Silverstein "acceptable" in all four categories).

According to Gonzales, he criticized Silverstein for having timely completed only one of five Geospatial Summary Reports.  Completion of those reports was one of Silverstein's goals.  See Gonzales Decl. ¶¶ 3-5, ECF No. 42-7, PageID # 400-01. In paragraph 29 of his Declaration, Silverstein says that he drafted all five reports, but that completion was delayed because

39

of the time taken by the peer-review process.  See ECF No. 51-1,
PageID # 637.  Gonzales points to the June 2012 mid-year
evaluation of Silverstein, in which Gonzales warned Silverstein
that he had only four months to complete the reports.  See
Gonzales Decl. ¶ 4, ECF No. 42-7, PageID # 400; ECF No. 42-18,
PageID # 481 ("GSRs need to move from 'Draft' to 'Final' more
quickly.  You have four months to complete remaining GSR[]s.  The
products received to date have been superb.").  The criticism
about the failure to timely complete four reports may have
related to the issue of whether Silverstein had appropriately
considered the time taken up by the peer-review process.

       Silverstein fails to raise a genuine issue of fact as
to pretext with respect to Gonzales's explanation.  He does not
dispute that he failed to timely complete all of the reports in
issue, although he attributes the delay to the length of the
peer-review process.  See Silverstein Decl., ECF No. 51-1, PageID
# 637.  Nor does Silverstein deny that Gonzales had warned him in
his mid-year evaluation that the reports had to be completed
within four months.  Silverstein does not even submit admissible
evidence that, in December 2012, when Gonzales signed the
performance review, he knew about Silverstein's EEO activity.  As
of December 2012, Silverstein had only contacted an EEO counselor
and made an informal complaint, the content of which is unclear.
Under these circumstances, the court grants summary judgment in

Defendant's favor on the portion of the retaliation claim based on the 2012 Annual Performance Review.

### b.   2013 Retention Initiative.

Silverstein says he was also retaliated against for having made EEO complaints when, on February 7, 2013, he was told that a retention initiative payment he had been receiving had been terminated effective August 2, 2009.  See First Amended Complaint ¶ 36, ECF No. 14, PageID # 47; Answer ¶ 36, ECF No. 24, PageID # 89 (admitting same).

Defendant's legitimate nondiscriminatory reason for that action was Silverstein's ineligibility for that payment given a change in his job.  Norma Gamulo, a Supervisory Civilian Program Management Specialist with the Department of Defense, POW/MIA Accounting Agency, says that Silverstein had been receiving a 10% retention incentive for working for the Central Identification Laboratory.  She says that, in August 2009, she prepared a form to terminate Silverstein's retention incentive because he stopped working as an Anthropologist for the Central Identification Laboratory and moved to a job outside the Central Identification Laboratory.

Gamulo says that, in December 2012, her office received a list from Washington of all employees receiving the retention initiative.  It was only then that she realized that, notwithstanding her action in August 2009, Silverstein had

continued to receive the retention incentive applicable to Central Identification Laboratory employees even after moving out of the Central Identification Laboratory. Gamulo says that she then submitted another form to terminate the retention incentive effective December 2012. She says that she made the effective date in December 2012, rather than August 2009, because she did not want Silverstein to be forced to reimburse any retention initiative payment he had already received. The retention incentive was then terminated effective December 14, 2012.

According to Gamulo, the human resources department in Silverdale, Washington, later discovered that Gamulo's original termination paper from 2009 had been sent to the wrong office. The human resources department then processed its own termination of Silverstein's retention initiative, this time effective August 2, 2009. That date created an obligation for Silverstein to return an overpayment totaling $22,339.88. Gamulo recalls that Silverstein appealed the revocation of his retention initiative. On August 12, 2014, the request for repayment of the overpayment was withdrawn, but the revocation of the retention initiative remained in effect. See Decl. of Norma Gamulo ¶¶ 1-11, ECF No. 42-6, PageID #s 395-97.

Silverstein disagrees with Gamulo's statement as to why the retention initiative ended. Silverstein speculates that Defendant looked into the overpayment while "auditing" him in

42

retribution for his EEO complaints.  He says no one else was
subject to such an "audit."  See Silverstein Decl. ¶ 27, ECF No.
51-1, PageID #s 633-34.  Not only does Silverstein fail to
describe the "audit" process, he does not suggest that any other
employee was allowed to continue to receive the incentive even
after becoming ineligible to receive it.  Silverstein fails to
raise a genuine issue of fact as to whether any discriminatory
motive led Gamulo to cancel the initiative.  He shows neither
that he continued to be entitled to it nor that Gamulo knew about
any EEO complaint he had made.  The record does not support any
tie between the EEO complaints and the cancellation of the
retention initiative.  Given the absence of any showing that
Defendant's action was pretextual, the court grants summary
judgment to Defendant to the extent Silverstein's retaliation
claim is based on the termination of the retention initiative.

### c.   February 2014 Removal From Laos Deployment.

Silverstein claims to have suffered retaliation for his
EEO complaints when his deployment to Laos was cancelled.  There
is no contention by the Government that this matter was not
properly exhausted.

In February 2014, Dr. William Belcher, an
Anthropologist/Archaeologist and Laboratory Manager for the
Central Identification Laboratory, learned that Operations (J3)
was planning to send an investigative team to Laos.  Silverstein

was initially "slotted" to act as the team's Recovery Leader, but the Central Identification Laboratory management team, which appears to have included Belcher, ultimately sent Dr. Jesse Stephen, a recently hired Archaeologist, instead.  This allegedly allowed the Recovery Team to conduct excavations that could not have been done had Silverstein remained as the Recovery Leader. Belcher says that the replacement in no way prevented the Research and Analysis Directorate from sending Silverstein to Laos as an Analyst, instead of as the Recovery Leader.  See Declaration of William Belcher ¶ 12, ECF No. 42-3, PageID # 386.

At the hearing on the present motion, Silverstein's counsel said that Laos would not have allowed excavations, but counsel conceded that the record contained nothing showing that limitation.

This court recognizes that Silverstein's January 2013 EEO complaint was making its way through the administrative process at the time Silverstein was taken off the Laos team in February 2014.  The employer's internal investigation relating to that January 2013 EEO complaint appears to have spanned the period from August 26 to October 16, 2013.  See ECF No. 42-10, PageID # 412.  As of September 1, 2014, that matter was still "pending an EEOC hearing."  See ECF No. 42-11, PageID # 418-19. That suggests that the administrative process was ongoing in some fashion in February 2014.  Given the lack of clarity in the

record of what, if any, finding may have resulted from the
internal EEO investigation of the January 2013 complaint, or of
what was happening in February 2014 with that complaint, the
court is uncertain whether the overlap in terms of timing between
the administrative process and Silverstein's removal from the
Laos team could fairly support an inference that they were
related.  The court cannot tell, for example, whether the
administrative process, while not yet completed, had been dormant
for such a substantial time as of February 2014 that it was
unlikely to have been a factor in the February 2014 decision.

Adding to the lack of clarity is the court's inability
to tell what was done by whom with respect to the February 2014
decision.  For example, Dr. William Belcher says in his
declaration that "we offered up Dr. Jesse Stephen . . . to lead
the team."  The use of the word "we" suggests that Belcher
participated in offering up Dr. Stephen.  Viewing the facts in
the light most favorable to Silverstein, this court assumes for
purposes of this discussion that Belcher played a role in
replacing Silverstein.

Although this court does not have Silverstein's actual
January 2013 EEO complaint, a Report of Investigation suggests
that Belcher was not named as an alleged wrongdoer in
Silverstein's January 2013 complaint.  Indeed, he may not have
been the subject of a Silverstein EEO complaint until two months

45

after Silverstein was removed from the Laos trip, when
Silverstein submitted his April 2014 internal EEO complaint
pointing to Belcher's role in removing Silverstein from the Laos
trip.  See ECF No. 42-11, PageID # 418.  While it would certainly
be a fair inference that an investigation would involve
discussing a complaint with alleged wrongdoers, no such inference
attaches here with respect to Belcher.

          Of course, even if not accused in the January 2013
complaint, Belcher might have known about it.  Silverstein
appears to have told personnel investigating that complaint that
Belcher knew about Silverstein's "previous EEO activity."
Silverstein apparently said the same about Dr. John Byrd and
Dr. Thomas Holland, who were also involved with the decision to
pull Silverstein off the Laos team.  See ECF No. 42-11, PageID
# 419.  The problem for this court with that assertion is that it
appears to be referring to knowledge about Silverstein's support
of women co-workers in 2009 and 2011, or of a disabled co-worker
in 2005.  While not concluding that the managers lacked knowledge
of that support, this court, noting Silverstein's claim that he
was pulled from the Laos team as a "reprisal" or in retaliation
for earlier actions, cannot fairly draw the inference that the
February 2014 action involving Laos was related to things
Silverstein did so many years earlier.  Any "protected activity"
by Silverstein must be closer in time to February 2014 to be

46

plausibly related to the Laos trip. A link with the ongoing investigation of Silverstein's January 2013 EEO complaint would fit the bill.

The record does include evidence that Silverstein had strained relations with Belcher long before being pulled from the Laos team in February 2014. As noted earlier in this order, Silverstein says that Belcher made a false statement about Silverstein that led to Silverstein's being reprimanded in August 2010. That reprimand was ultimately rescinded. Possibly, Belcher might have harbored ill-will toward Silverstein over that rescission. But if that caused Belcher to retaliate in February 2014, that kind of retaliation would not, at least on the present matter, fall within the scope of Title VII. Not every retaliatory action supports a Title VII claim.

Similarly, Silverstein and Byrd had had prior negative encounters. As discussed earlier, Silverstein had complained in May 2011 that Byrd had committed ethics violations. If Byrd retaliated by participating in Silverstein's removal from the Laos team in February 2014, that would not, absent a showing not present in the record, be retaliation prohibited by Title VII.

Lacking even a specific allegation, much less some sort of admissible evidence, that those participating in the February 2014 decision to pull Silverstein from the Laos team knew about his pending January 2013 complaint, this court concludes that

47

Silverstein does not make out a prima facie case that the
February 2014 decision related to his pending January 2013
complaint.

### d.   July 2014 Failure to Promote.

In May 2014, the creation of the new position of
Supervisory Historian of the World War II section of Research and
Analysis was announced.  See First Amended Complaint ¶ 39, ECF
No. 14, PageID # 48; Answer ¶ 39, ECF No. 24, PageID # 89
(admitting same).  Silverstein applied for but was not selected
for this promotion.  See Answer ¶ 40, ECF No. 24, PageID # 89.

Lawrence Gonzales, Silverstein's supervisor, was the
chair of the panel that interviewed and ranked candidates for the
position.  The other members of the panel were Ronald Minty,
Director of Operations, and Christopher Bazin.  The panel
reviewed the resumes of eight eligible candidates and asked them
the same questions in interviews.  Each panel member then
individually scored the candidates without discussing them with
the other panelists.  Decl. of Lawrence Gonzales ¶ 8, ECF No. 42-
7, PageID # 402; Decl. of Ronald Minty ¶ 4, ECF No. 42-8, PageID
# 404; Decl. of Christopher Bazin ¶ 2, ECF No. 42-2, PageID
# 379-80.  The panel members unanimously chose Dr. Gregory
Kupsky.  Gonzales gave Kupsky a score of 44, Minty gave him a
score of 40, and Bazin gave him a 50, which was a perfect score.
Decl. of Lawrence Gonzales ¶¶ 6-7, ECF No. 42-7, PageID # 399;

Decl. of Ronald Minty ¶¶ 2-3, ECF No. 42-8, PageID # 404; Decl. of Christopher Bazin ¶ 3, ECF No. 42-2, PageID # 380.

Silverstein learned in July 2014 that he had not been selected.  He apparently thinks he should have been selected because of his experience and years of service, which exceeded Kupsky's.  See Report of Investigation, ECF No. 42-12, PageID # 428.  The scores Silverstein received were far below Kupsky's. Gonzales gave Silverstein a score or 32, while Minty gave him a score of 31, and Bazin gave him a score of 34, putting Silverstein in the middle of the ranking of the eight eligible applicants.  See Gonzales Decl. ¶¶ 6-8, ECF No. 42-7, PageID #s 401-02; Decl. of Ronald Minty ¶¶ 2-4, ECF No. 42-8, PageID #s 404-05; Decl. of Christopher Bazin ¶¶ 2-3, ECF No. 42-2, PageID #s 379-80.  Each panel member provides legitimate nondiscriminatory reasons for his ranking.

Gonzales says that Kupsky was already working in the World War II section, while Silverstein was not.  Gonzales described Kupsky as organized and articulate and as having a clear vision based on experience.  Gonzales says that Silverstein, on the other hand, lacked a clear understanding of the job, as shown by his comments about the travel that Silverstein mistakenly assumed the position would involve.  Id. ¶ 7, PageID # 401-02.

Minty was impressed by Kupsky's enthusiasm and his focus on building relationships with other departments and on ensuring that subordinates had the tools to do their jobs.  Minty liked the initiative Kupsky had shown in creating a newsletter. Noting that Silverstein kept repeating things, Minty characterized Silverstein as unorganized.  Minty Decl. ¶¶ 4-5, ECF No. 42-8, PageID # 405-06.

Bazin noted Kupsky's poise and his familiarity with the World War II division.  Silverstein, in Bazin's opinion, had organizational challenges and appeared to want field work rather than the work involved in the position in issue.  Bazin thought it would be better for the supervisor to remain in Honolulu. Bazin Decl. ¶¶ 3-4, PageID #s 380-81.

Silverstein claims that there was "innate prejudice" involved in the selection.  Notwithstanding the thinness of the record in this regard, the court finds a genuine issue of fact as to whether Defendant's reasons for selecting someone other than Silverstein were pretextual.  Notably, the decision was made while Silverstein's EEO complaints were being investigated, and Gonzales, who was part of the hiring panel, was named in the January 2013 complaint as someone who had discriminated against Silverstein.  See ECF No. 41-10, PageID # 10.  The Report of Investigation of November 7, 2013, indicates that a "CDR Gonzalez" was interviewed with respect to the January 2013 EEO

complaint.  Gonzales appears to be "CDR Gonzalez."  <u>See</u>
Silverstein Decl. ¶ 29, ECF No. 51-1, PageID # 637 (calling
Gonzales "CDR Gonzales").  Gonzales was thus apparently aware of
Silverstein's EEO activity against him at the time the decision
not to promote Silverstein was made.

Silverstein appears to have complained in the January
2013 complaint that it was Gonzales who informed him that two
employees were being removed from his supervision and his section
was being reorganized.  Silverstein also appears to have
complained about his 2012 evaluation, which may have affected his
compensation.  <u>See</u> ECF No. 42-10, PageID #412.  Defendant is not
contending that the January 2013 complaint failed to qualify as
"protected activity" under Title VII.  This court concludes that
there is a question of fact as to whether Gonzales had a
retaliatory motive.  This is so even if the allegations in the
January 2013 complaint relating to Gonzales could be said to be
unrelated to Title VII.  The EEO complaint appears to have
included other matters within the scope of Title VII, albeit
implicating employees other than Gonzales.  This court thinks it
reasonable to assume that the investigator's interviews of all
the alleged bad actors would have included questions going to
matters such as sex discrimination.  Gonzales thus likely knew
there was a complaint about him included in a complaint about
Title VII matters.  While this court is certainly in no position

51

to say that Gonzales was indeed being retaliatory, there is enough in the record to create a genuine issue of material fact as to that issue to defeat summary judgment on this particular part of the retaliation claim.  That is all Silverstein needs.

In determining that a question of fact exists as to whether Gonzales had a retaliatory motive in preferring someone other than Silverstein for the Supervisory Historian position, the court is aware that Silverstein has submitted no admissible evidence that either Minty or Bazin was prejudiced against him because of the EEO complaints.  At the hearing, Silverstein suggested that Gonzales and Minty did not rate him highly because Silverstein had been critical of them.  Silverstein said he was critical of Minty after Minty prevented Silverstein from traveling to Tarawa Atoll in September 2012, but there is no evidence tying any such criticism (whatever its content was, which is unclear) to the Supervisory Historian decision nearly two years later.  Nor does Silverstein provide any reason that Bazin similarly rated him lower than Kupsky.  Silverstein only notes that Bazin was the junior member of the panel.  If Minty and Bazin could have outvoted Gonzales, Silverstein might not have been selected even if Gonzales's allegedly retaliatory vote had been disregarded.

Nevertheless, because the court cannot discern from the record how the hiring process proceeded after the ranking of the

applicants, the court cannot say on the present record that there
is no triable issue as to whether the failure to promote
Silverstein was influenced by a retaliatory motive on the part of
Gonzales.  For example, it is not clear that each of the rankings
was given identical weight, or that, even if the rankings were
independent, they necessarily required appointment of Kupsky.  If
Gonzales had ranked Silverstein higher, there might have been a
discussion that might have affected the outcome, possibly causing
another panel member to rethink his rankings.  Again, this court
is not assuming that Gonzales actually acted out of anything
retaliatory.  The court is instead saying that there is enough to
create a triable issue as to that matter.  The court therefore
denies summary judgment with respect to the part of the
retaliation claim based on the failure to promote Silverstein to
the Supervisory Historian position.

V.        **HOSTILE WORK ENVIRONMENT CLAIM.**

          **A.   Law Applicable to Hostile Work Environment Claim.**

          To prevail on a hostile work environment claim under
Title VII, a plaintiff must show that his or her "workplace was
permeated with discriminatory intimidation . . . that was
sufficiently severe or pervasive to alter the conditions of [his]
employment and create an abusive working environment."  Brooks v.
City of San Mateo, 229 F.3d 917, 923 (9th Cir. 2000) (internal
quotation marks and citations omitted).  A court examines the

53

totality of the circumstances in determining whether a claimant presents evidence that the work environment was both subjectively and objectively abusive.  Id.

"When assessing the objective portion of a plaintiff's claim, we assume the perspective of the reasonable victim."  Id. at 924.  When determining whether an environment was sufficiently hostile or abusive, a court must examine all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance.  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).  Title VII is not a "general civility code."  Id. at 788.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Id. (internal citation omitted); Davis v. Team Elec. Co., 520 F.3d 1080, 1095 (9th Cir. 2008).

A hostile work environment frequently involves "repeated conduct."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002).  The unlawful employment practice therefore need not necessarily occur on one particular day, but instead may span a period of days or even years.  Id.  In other words, a hostile work environment often involves separate but related acts that collectively amount to an unlawful employment practice.  For

example, the Ninth Circuit has recognized a hostile work environment when an employee "endured an unrelenting barrage of verbal abuse," including having other employees habitually call him sexually derogatory names, refer to him as female, and taunt him for behaving like a woman.  See Nichols v. Azteca Restaurant Enters., Inc., 256 F.3d 864, 872 (9th Cir. 2001).  As the Ninth Circuit explains, "claims that raise a genuine issue of material fact as to the existence of a hostile environment involve allegations of continuing violations."

In Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1108 (9th Cir. 1998), the Ninth Circuit stated:

> Here, Draper has testified that she was subject to the same sort of harassment by Anelli on a regular basis, and that she constantly felt uncomfortable and upset at work.  As in most claims of hostile work environment harassment, the discriminatory acts were not always of a nature that could be identified individually as significant events; instead, the day-to-day harassment was primarily significant, both as a legal and as a practical matter, in its cumulative effect.  Because Draper's hostile work environment claim is not based upon a series of discrete and unrelated discriminatory actions, but is instead premised upon a series of closely related similar occurrences that took place within the same general time period and stemmed from the same source, her allegations set forth a claim of a continuing violation.

Id.

The necessary showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or

frequency of the conduct.  Ellison v. Brady, 924 F.2d 872, 878
(9ᵗʰ Cir. 1991).  Accordingly, even though a hostile work
environment claim usually involves related conduct over a period
of time, a single serious act may be sufficient to establish a
hostile work environment.  Id. (citing Vance v. S. Bell Tel. &
Tel. Co., 863 F.2d 1503, 1510 (11ᵗʰ Cir. 1989)), for proposition
that noose hung over work station was sufficiently severe to
create genuine issue of fact regarding hostile environment based
on race).  It is enough that the hostile conduct pollutes the
victim's workplace, making it more difficult for the victim to do
his or her job, to take pride in the work, and to want to stay in
the position.  See Vanhorn v. Hana Grp., Inc., 979 F. Supp. 2d
1083, 1097 (D. Haw. 2013).

Because a hostile work environment, unlike a discrete
act, may not be tied to a particular day and instead may develop
over time, the events making up a hostile work environment claim
are not limited to those within the limitations filing period.  A
hostile work environment claim "is composed of a series of
separate acts that collectively constitute one unlawful
employment practice.'"  Morgan, 536 U.S. at 103.  Therefore,

> it does not matter that some of the component
> acts fall outside the statutory time period.
> Provided that an act contributing to the
> claim occurs within the filing period, the
> entire time period of the hostile environment
> may be considered for the purposes of
> determining liability.  That act need not be
> the last act.  Subsequent events may still be

> part of the one claim, and a charge may be
> filed at a later date and still encompass the
> whole.  Therefore, a court's task is to
> determine whether the acts about which an
> employee complains are part of the same
> actionable hostile work environment practice,
> and if so, whether any act falls within the
> statutory time period.

Id.

### B.  The Court Grants Summary Judgment in Favor of Defendant With Respect to Silverstein's Hostile Work Environment Claim.

Silverstein does not clearly articulate the bases for
his hostile work environment claim.  He states generally on pages
23 to 24 of his Opposition that he suffered a hostile work
environment because he engaged in a protected activity and
suffered several adverse employment actions, but he does not
clearly describe the hostile work environment, leaving it to the
court to discern his argument.  See ECF No. 50, PageID #s 605-06.
This court is unable to discern conduct that was sufficiently
severe or pervasive to alter the conditions of his employment and
create an abusive working environment.  Brooks, 229 F.3d at 923.
Additionally, because Silverstein does not show that the various
events he complains of are related, as opposed to being separate,
unrelated acts by different people in a department of 400 to 600
individuals, he does not show that the limitations period should
relate back to encompass all of those many acts.  Finally,
especially with respect to the conduct preceding his EEO

complaints, Silverstein fails to tie the allegedly hostile work environment to anything within the scope of Title VII.

As the Supreme Court noted in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." Instead, to have an actionable hostile work environment claim under Title VII, a plaintiff must demonstrate that the work environment was hostile with respect to a class protected by Title VII. See, e.g., Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1034 (9th Cir. 2005) (noting that plaintiff asserting Title VII hostile work environment sexual harassment claim must demonstrate that harassment was based on sex); Manatt v. Bank of Am., NA, 339 F.3d 792, 798 (9th Cir. 2003) (stating that plaintiff asserting Title VII hostile work environment racial harassment claim must demonstrate that harassment was based on race); Mendoza v. Sysco Food Servs. of Arizona, Inc., 337 F. Supp. 2d 1172, 1184 (D. Ariz. 2004) (stating that plaintiff asserting Title VII hostile work environment national origin harassment claim must demonstrate that harassment was based on national origin).

Title VII makes it unlawful for an employer to discriminate with respect to compensation, terms, conditions, or privileges of employment based on race, color, religion, sex, or

national origin.  See Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)).  In other words, Title VII does not protect individuals from a hostile work environment based on something outside the scope of Title VII, such as work performance or personality.

Silverstein cannot base his Title VII hostile work environment claim on matters unrelated to Title VII.  Thus, given the lack of evidence that Dr. Moore was publicly humiliated because of race, color, religion, sex, or national origin, anything Silverstein suffered for having supported Dr. Moore in 2005 is not actionable under Title VII.

Similarly, the court can find no tie to Title VII in Silverstein's claims that he was subjected to a hostile work environment because he submitted ethics complaints in 2011 and 2012.  The ethics complaints concerned procedural violations, ethics, waste, or abuse.  Silverstein provides no evidence that any ethics complaint related to race, color, religion, sex, or national origin.  Nor do the occurrences he says he suffered because he submitted ethics complaints relate to Title VII.  He complains that his ethics complaints led to an October 2011 discussion about how to make reports, his being pulled from a Tarawa Atoll mission in September 2012, a denial of leave to accept an award in the fall of 2012, a July 2012 decision implemented in October 2012 to transfer two employees, and the

October 2012 denial of leave for medical reasons.  Silverstein
makes no showing that any of those actions related to race,
color, religion, sex, or national origin.  Because Title VII is
not a "general civility code," see Faragher, 524 U.S. at 788, the
court rules that Silverstein raises no genuine issue of fact as
to whether he was subjected to a hostile work environment in
violation of Title VII based on these acts.

       This court is left with examining whether Silverstein's
hostile work environment claim may be grounded in his four
remaining retaliation allegations.  Those allegations address his
EEO complaints in 2012 and 2013, including (1) his 2012
performance review, (2) the cancellation of his retention
initiative in 2013, (3) his lack of inclusion in the team that
went to Laos in February 2014, and (4) his failure to be promoted
in May 2014 to the Supervisory Historian position.  Viewed from a
reasonable plaintiff's perspective, the totality of the
circumstances could not be said to raise an issue of fact as to
whether Silverstein's work environment was both subjectively and
objectively abusive for Title VII purposes.  See Brooks, 229 F.3d
at 923.  Nor does the record show a relationship among the
matters complained of; they appear to have involved discrete
acts, not any course of conduct by particular individuals acting
with the same motive or bias for which Silverstein's employer can
be held accountable.  Even when the court considers the March

2010 cancellation of the trip to Tarawa Atoll, the August 2010 reprimand, or the 2011 counseling, no course of conduct (as opposed to discrete acts) can be inferred.

This court turns first to Silverstein's 2012 performance review by his supervisor, Lawrence Gonzales. Silverstein raises no genuine issue of fact as to whether Gonzales's performance review was part of an environment that objectively abusive from a reasonable victim's perspective. Gonzales gave Silverstein the highest rating in each of the four categories and criticized him only for not having completed reports on a timely basis.  Silverstein does not dispute that the reports were not completed on time.  While he attributes any delay to the peer-review process, that does not indicate that the review contributed to a hostile environment actionable under Title VII.  Nothing about the review is tied by Silverstein to evidence of race, color, religion, sex, or national origin discrimination.  Notably, the review occurred one or more years after Silverstein says he supported other co-workers who complained about sex discrimination.  See ECF No. 42-18, PageID # 476 (showing Dec. 13, 2012, as date Gonzales signed 2012 performance review).  Silverstein does not complain about his performance reviews in other years, which suggests that this review was not part of a pattern.  Nor does Silverstein discuss whether other employees with comparable criticisms about

61

timeliness were treated differently such that his particular situation was, by contrast, hostile.

Second, with respect to losing his retention initiative, Silverstein again fails to demonstrate that, from a reasonable victim's perspective, there is a question of fact as to whether the conduct was part of an objectively abusive environment.  Having left the Central Identification Laboratory, Silverstein was not entitled to continue to receive the retention initiative applicable to employees of the Central Identification Laboratory.  Although Silverstein concludes that he was "audited" in December 2012 while no other employee was similarly "audited," Silverstein does not detail what the "audit" consisted of and gives no indication of having personal knowledge that other employees were allowed to continue to receive the retention initiative after ceasing to be eligible for that.

As discussed earlier in this order, Gamulo says she noticed that Silverstein was improperly receiving the retention initiative when she got a letter from Washington with the names of employees receiving the initiative.  Nothing in the record indicates that Gamulo was motivated by anything other than Silverstein's ineligible status.  Silverstein does not point to any hostility by any particular individual at all relating to the retention initiative.  In fact, nothing in the record suggests that Gamulo even knew about the EEO complaints.  While

Silverstein was told on February 2, 2013, that he had to reimburse the overpayments he had received, that reimbursement requirement was ultimately rescinded.  There is no evidence that the initial reimbursement requirement was imposed by anyone with a discriminatory or retaliatory movive, or that, before the requirement was rescinded, it so pervaded the work environment that it created a hostile or abusive atmosphere.

Third, with respect to not having been deployed to Laos in February 2014, Silverstein again fails to show objective abusiveness that permeated his work environment.  The Central Identification Laboratory decided to send Dr. Stephen as the Recovery Leader instead of Silverstein, allegedly because Dr. Stephen was an Archaeologist who could do excavations that Silverstein could not.  The court finds nothing in the record suggesting that the choice of Dr. Stephen was in any way related to race, color, religion, sex, or national origin.  At most, the court notes that Silverstein was pulled from the Laos position around the time that Silverstein's section was apparently seeking to counter an attempt to terminate a co-worker on what the section thought was a "possibly racially motivated" ground.  See ECF No. 42-11, PageID # 419.  But that does not mean that being pulled from a Laos trip created or contributed to a hostile work environment.

63

The record refers to only three specific trips--one to Tarawa Atoll organized in March 2010, one to Tarawa Atoll organized in September 2012, and one to Laos organized in February 2014.  These are far enough apart as not to constitute a pattern, especially when the cancellations were by different people (March 2010 Tarawa Atoll by Dr. Gregory Fox; September 2012 Tarawa Atoll by Ronald Minty; and 2014 Laos by Dr. William Belcher).

In concluding that Silverstein cannot sustain his hostile work environment claim, the court is mindful of the distinction between a hostile work environment actionable under 42 U.S.C. § 2000e-2 and a hostile work environment constituting an adverse employment action in a retaliation claim under 42 U.S.C. 2000e-3(a).  The former requires proof that the work environment is hostile based on a person's race, color, religion, sex, or national origin.  Thus, for example, the workplace may be rife with racist or sexist comments.  By contrast, the Ninth Circuit's reasoning in Ray v. Henderson, while relating to a hostile work environment that can serve as an adverse employment action in a retaliation claim, says nothing about the need to show an environment pervaded by discrimination based on race, color, religion, sex, or national origin.  Instead, under Ray, it might arguably suffice if the pervasive hostility involves something that on its face appears unrelated to Title VII (e.g.,

frequent comments about a disability), provided the hostility flows from a retaliatory attitude toward someone who engaged in activity protected by Title VII, such as having filed a race discrimination complaint.

In the present case, that is a distinction without a difference because, whether under 42 U.S.C. § 2000e-2 or under 42 U.S.C. 2000e-3(a), the hostile work environment must involve a pervasive atmosphere. Silverstein does not provide evidence that the incident involving the Laos trip was part of any atmosphere, much less an atmosphere that was objectively permeated with hostility so severe and pervasive from a reasonable victim's perspective that it could be said to have changed the terms and conditions of Silverstein's working environment.[2]

---

[2]One of the Reports of Investigation refers to "several years [of] history of CIL managers (Dr. Byrd, Dr. Holland and Dr. Belcher) actively denying [Silverstein] opportunities to deploy." ECF No. 42-11, PageID #419. The Report says that Silverstein's supervisors knew that management would reallocate personnel to prevent Silverstein from having travel opportunities. Id. However, the Report notes that Silverstein "has no comparator for this incident." Id. If the reference to the lack of a comparator means that Silverstein failed to show that other similarly situated employees had more travel opportunities than he did, this court shares that concern. The only specific travel opportunities before this court are the 2010 and 2012 Tarawa Atoll trips and the 2014 Laos trip, which are so separated in time that this court cannot infer that they were part of the same continuing hostility or the same work environment. Even if the reference to the lack of a comparator instead refers to the absence of anyone else denied travel opportunities with comparable frequency, that circumstance does not transform the Laos trip from a discrete incident into part of a work environment that was pervasively abusive. Actions regarding three trips over four years do not translate into a pervasive atmosphere.

Finally, with respect to the May 2014 failure to promote Silverstein, the court again identifies no genuine issue of fact as to the objective abusiveness of the work environment. While this court thinks there is a triable issue of fact as to whether the May 2014 incident involved retaliation, Silverstein does not show that that incident created or contributed to an abusive atmosphere. The denial of a promotion was presumably very disappointing (and may have been retaliatory), but it was a discrete incident. Silverstein does not show its effect on the pervasive work environment.

The court notes that, "in late 2015," Silverstein "applied for a position as an archaeologist at DPAA and was passed over." See Silverstein Decl. ¶ 28(m), ECF No. 51-1, PageID # 637. Silverstein says that, after an investigation, he was offered some sort of a position that he declined out of concern that management would use his probationary period in the new position to terminate him. Id. At the hearing on the present motion, Silverstein explained that it was a position as a Historian that he declined to accept in 2016. He conceded that nothing relating to the 2016 position goes to any claim in this case, which is consistent with his statement in his declaration that he applied for a position "in late 2015," several months after the First Amended Complaint was filed. The court therefore

does not here take into account the 2016 Historian position,
which, in any event, no party has asked the court to consider.

Although Silverstein does not appear to link the
October 2012 denial of his request for limited duty to his
informal contact with the EEO counselor on October 3, 2012, the
court examines whether that denial might be relevant to his
hostile work environment claim, given the timing of those events.
Silverstein raises no genuine issue of fact as to whether that
denial was so objectively abusive that it supports a hostile work
environment claim.  There is no evidence that the Joint POW/MIA
Accounting Command had a teleworking policy.  It is not clear
from the record that the denial did anything more than continue
the status quo, which Silverstein does not show was pervasively
hostile in a manner actionable under Title VII.

The bottom line for this court is that Silverstein does
not raise a question of fact as to whether his "workplace was
permeated with discriminatory intimidation . . . that was
sufficiently severe or pervasive to alter the conditions of [his]
employment and create an abusive working environment." Brooks,
229 F.3d at 923.  Silverstein instead complains of discrete acts
by different individuals at different times, many of them not
actionable under Title VII.  Even when incidents are tied to
Title VII, only one is sufficient to survive this summary
judgment motion, and then only with respect to Silverstein's

Title VII retaliation claim, not his hostile work environment claim.  That instance and the other occurrences Silverstein points to are insufficient even in combination to establish the severe and pervasive environment required for a hostile work environment claim.  Silverstein does not show that those acts, either alone or together, created an abusive working environment that pervaded the workplace.  Summary judgment is therefore granted in favor of Defendant with respect to the hostile work environment claim.

## VI.       CONCLUSION.

The court grants Defendant's motion to dismiss the Title VII retaliation claim to the extent it is based on facts alleged in paragraphs 14, 17, 22, 24, 25, and 30 of the First Amended Complaint (except with respect to the part of the retaliation claim involving the Laos trip).  Any retaliation claim based on those allegations was not properly exhausted.

Turning to the remaining portion of the retaliation claim, this court denies summary judgment with respect to the part of the retaliation claim based on the failure to promote Silverstein to the Supervisory Historian position, but grants Defendant summary judgment favor with respect to all other remaining bases of the retaliation claim.

The court grants summary judgment in Defendant's favor with respect to the hostile work environment claim.

68

Silverstein's retaliation claim based on the failure to hire him as the Supervisory Historian remains for further adjudication.


IT IS SO ORDERED.

Dated:  Honolulu, Hawaii, August 11, 2016.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge


Silverstein v. Carter, Civ. No. 15-00097 SOM/KJM; ORDER (a) DISMISSING RETALIATION CLAIM ASSERTED IN PARAGRAPHS 14, 17, 22, 24, 25, AND 30 OF THE FIRST AMENDED COMPLAINT, AND (b) GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT WITH RESPECT TO REMAINING CLAIMS